IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 1 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent-Plaintiff | § | |
| | § | |
| v. | § | CR B-00-403-02 |
| | § | |
| MARK ANTHONY MARTINEZ, | § | |
| Petitioner-Defendant | § | |
| (CA B-03-221) | § | |

GOVERNMENT'S ANSWER AND MOTION FOR DISMISSAL
UNDER 8(a) OF THE RULES FOLL. 28 U.S.C. § 2255

1.

The court ordered the government to respond to Martinez' 28 U.S.C. §2255

motion. The Honorable Judge Hilda Tagle found that the untimely filing of the

motion to vacate sentence on December 8, 2003 was due to excusable neglect and

with good cause, based upon Martinez' affidavit under penalty of perjury and

accompanying documents, that he attempted to file his motion to vacate sentence

through inmate mail on October 29, 2003, but the mail was returned due to a error

in the address of the Federal Courthouse in Brownsville, Texas (Docket sheet from

Civil Cause of Action, no. CV B-03-221–Doc. 1-3, 4).

The government's deadline for responding to the post-conviction petition is

June 1, 2004 (Docs. 172, 180; Doc. 172–attachment  denominated "declaration of

1

mailing"). The government was ordered by the court to include relevant transcripts and the sentencing record, but those documents are already on file in the district clerk's office (Record entry September 26, 2003). The government moves to dismiss and, in the alternative, moves for summary judgment.

2.

The government denies each and every allegation of fact made by Martinez, except those supported by the record and those specifically admitted herein, and demands proof thereof.

3.

Martinez, Albert Thomas Reyes, and Roberto Contreras were indicted on September 26, 2000 in the Brownsville Division of the Southern District of Texas in CR B-00-403 and charged with conspiracy to possess with intent to distribute more than 100 kilograms of marihuana and more than 500 grams of cocaine, committed between September 1 and September 7, 2000, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 846 (count one); aiding and abetting the possession with intent to distribute 4.1 kilograms of cocaine, committed on September 7, 2000, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§841(a)(1) and 841(b)(1)(B (count two); and aiding and abetting the possession with intent to distribute 362.7 kilograms of marihuana, committed on September 7, 2000, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§

2

841(a)(1) and 841(b)(1)(B) (1 R. 1).    Martinez hired attorney Ed Cyganiewicz to represent him (Doc. entry dated September 9, 2000; Doc. 1).

A motion in limine was filed by Martinez prior to trial seeking to have the district court rule on Fed. R. Crim. P. 404(b) evidence (Doc. 34).    The government identified evidence of surveillance of Martinez on August 29, 2000 and the discovery of 14 grams of marihuana in a hotel room occupied by Martinez. The government also indicated its intent to tie Martinez to a blue Chevrolet Impala on that date in connection with proof of Martinez' connection to the vehicle on September 7, 2000. The court authorized the admission of the evidence   (Hearing transcript, dated November 7, 2000, pp. 16-21).

Attorney Cyganiewicz filed a motion to suppress, motion to determine co-conspirator statements as exceptions to the hearsay rule and a motion to sever (Docs. 28, 36, 54, 56, 63).    Attorney Crispin C.J. Quintanilla was also hired by Martinez as co-counsel (Docs. 51, 54).

The suppression hearing was heard over several days, and was carried until the trial (Docs. 64, 68, 70, 73, 74). The motions to suppress and sever were denied (Docs. 68, 73). Martinez was found to lack standing to challenge the search of the premises where contraband was located (Doc. 68).

The parties stipulated to proof that GX 19 was 798.4 pounds of marihuana and GX 20 was 4.1 kilograms of cocaine seized one mile north of state road 510 on Farm-to-Market road 803 on September 7, 2000 (Hearing transcript, dated 11/7/00, pp. 6-13). All of the government's exhibits were admitted–GX 1 through 20, and 41-48, some over objections, prior to trial (Hearing transcript, dated 11/7/00, pp. 6-11).

A jury trial against Reyes, Martinez and Contreras commenced November 6, 2000 and concluded November 9, 2000 (Docs. 70, 74, 82, 89). The jury convicted Reyes and Martinez of all counts and acquitted Contreras of all counts (Docs. 89, 95; 7 R. 460).

The probation department scored Martinez at base offense level 32 under USSG §2D1.1(c)(4). No additional adjustments were recommended (PSR, ¶¶26-39). His criminal history score was a category VI based upon 14 qualifying points, resulting in a punishment range of 210 to 262 months imprisonment (PSR, ¶¶36-50, 74). Martinez filed written objections to the PSR (Doc. 106), and the probation department responded (Addendum to the PSR).

At sentencing held on February 12, 2001 the court overruled Martinez' objections. The court sentenced Martinez to concurrent 240-month terms of imprisonment under counts one through three, followed by concurrent four-year

4

supervised release terms. He was also ordered to pay $300 in special cost assessments (Docs. 119, 121; Sentencing transcript, pp. 2-10).

Martinez, represented by attorney Ralph Martinez, unsuccessfully appealed. *United States v. Martinez*, 01-40194, 2002 WL 1899608 (5th Cir. July 11, 2002)(Unpublished). The mandate issued August 2, 2002 (Doc. 141). Martinez unsuccessfully pursued a petition for writ of *certiorari. Martinez v. United States*, 537 U.S. 1011, 123 S.Ct. 479 (November 4, 2002)(02-6558).

In pleadings unrelated to the criminal conviction, Martinez sought the return of certain property, based upon a motion filed on August 6, 2001 (Doc. 125). The government was later ordered to respond to the request, and the government filed its response on September 30, 2002 (Docs. 143, 147). The court denied the motion for return of property on October 18, 2002 (Doc. 150). Martinez unsuccessfully appealed that denial (Docs. 154, 157, 159, 162). *United States v. Martinez*, 02-41669 (5th Cir. August 8, 2003)(failure to pay docketing fee)(Doc. 162)(See Fifth Circuit website for docket sheet).

On December 3, 2003, Martinez mailed the instant motion to vacate sentence under 28 U.S.C. §2255, and the pleading was filed on December 8, 2003 (Doc. 172), and the court found the pleading was timely filed (CV B-03-221–Doc. 4). The government moves for dismissal.

5

4.

## ALLEGATIONS

Martinez contends his retained "trial counsel" rendered ineffective assistance of counsel at trial. Martinez does not identify which of the two trial attorneys were ineffective. In any event, Martinez complains that by pursuing a strategy that would establish Martinez' standing to challenge the search of the premises where contraband was found, his testimony could not be employed at trial. He faults the agreement to stipulate to the chain of custody of evidence, and the failure of counsel to better cross-examine law enforcement officers as to their identification of marihuana found in a shed prior to drugs found in the adjacent vehicle.

In a fourth ground of review, Martinez blends a challenge to the adequacy of proof against him and counsel's failure to better prosecute a defense in the case, including a failure to attack the court's jury instructions. In ground six, Martinez faults a "conflict of interest" between the co-defendants at trial and the questions posed to each defendant. Martinez claims that co-defendant Reyes was willing to testify on his behalf, but did not.

5.

The pleading under 28 U.S.C. §2255 is timely, having been filed before the one-year expiration period, including the 90-day period within which Martinez could

have filed a petition for writ of *certiorari*. *United States v. Gamble*, 208 F.3d 536 (5th Cir. 2000). The court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §2255 (eff. April 24, 1996). Martinez is currently incarcerated a United States Bureau of Prisons facility in Pollock, Louisiana. He seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2255 from his conviction in the Brownsville Division of the Southern District of Texas. A § 2255 motion "provides the primary means of collaterally attacking a federal conviction and sentence." *Jeffers v. Chandler*, 234 F.3d 277, 279 (5th Cir. 2000) (citation omitted). Relief under a §2255 motion "is warranted for errors that occurred at trial or sentencing." *Id.* He seeks relief from his conviction and sentence, and the relief sought under § 2255 is appropriate .

At no time does Martinez claim that his attorney failed to investigate the case; rather, he faults the defensive strategy that did not employ his current theories. *See United States v. Faubion*, 19 F.3d 226, 230-31 (5th Cir. 1994); *United States v. Balzano*, 916 F.2d 1273, 1296 (7th Cir. 1990) ("In order to establish prejudice resulting from a failure to investigate, the defendant must make 'a comprehensive showing of what the investigation would have produced.'"); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the

investigation would have revealed and how it would have altered the outcome of the trial.").

6.

**Ineffective assistance of counsel claim**

Martinez is required to "show that: (1) his attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that except for the attorney's unprofessional errors, the results of the proceeding would have been different." *United States v. Bounds*, 943 F.2d 541, 544 (5th Cir. 1991)(citations omitted). Those requirements are based upon a showing that trial counsel's performance was constitutionally deficient, and that deficiency prejudiced the defendant. *See United States v. Reinhart*, 357 F.3d 521, 524 & n.8 (5th Cir. 2004)(citing, *inter alia*, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984) and *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)). "An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 892 (5th Cir. 1999)(citations omitted).

A claim of ineffective assistance of counsel may be rejected based on an insufficient showing of prejudice, without inquiry into the adequacy of counsel's

8

performance. *Micheaux v. Collins*, 911 F.2d 1083, 1090-91 (5th Cir. 1990). The failure to prove both components of the *Strickland* test, either a deficient performance or actual prejudice, defeats an ineffective assistance claim. *United States v. Abner*, 825 F.2d 835, 846 n. 18 (5th Cir. 1987); *see also United States v. Gaudet*, 81 F.3d 585, 592 (5th Cir. 1996); *United States v. Rosalez-Orozco*, 8 F.3d 198, 199 (5th Cir. 1993)(citations omitted).

7.

## Summary of Facts

On August 28, 2000, Martinez was observed in Harlingen, Texas by surveillance officers, including Harlingen Police Detective Lionel "Leo" Silva. Martinez was seen driving a blue Chevrolet Impala during the surveillance. The vehicle was not registered to Martinez (trial transcript, p. 197). Detective Silva was conducting surveillance on a group of persons staying at the Sun Valley Motor Hotel in Harlingen, Texas . One of the occupants of the room was stopped to identify that person. A blue Chevy Impala was pulled over, driven by Martinez, who was accompanied by Cindy Cruz (trial transcript, pp. 168-71, 198; GX 10–photo of Chevy Impala taken August 28, 2000). Cruz and Martinez were arrested when they were found in possession of 14 grams of marihuana in the hotel room where they were staying (trial transcript, pp. 204-06).

On September 1, 2000, Reyes, a resident of Houston, Texas, met with real estate agent Ron Waters and John Allison for the purpose of placing a down payment on an 11 acre farm owned by Allison located in the Olmito area in South Texas. The ranch was located on Farm to Market roads 510 and 803. Reyes offered to buy the property for $100,000, with a $9,000 cash deposit, with a closing date of October 4, 2000. The government's view of the property was that it would serve as an excellent

stash house: the property was in a rural area; it was removed from main streets; the land was bordered by lots of brush, particularly in the rear of the premises; and the property also included a shed at the rear of the ranch house (trial transcript, pp. 179-82, 214-18, 228-30; trial transcript, pp. 252-55, 258-61, 294, 302-03; GX 49–Survey map of Allison 11 acre tract and adjacent lots).

Reyes inquired if he could reside on the property while the sale was pending, and Allison refused the request. Reyes was expressly refused the right to remain on the premises overnight. Reyes then proposed to move furniture and other items onto the property, and Allison advised that such request was permitted. Reyes never moved furniture onto the property. Reyes executed the earnest money contract (trial transcript, pp. 214-21).

Waters identified GX 39, a receipt for three lots that Reyes also wanted to purchase from Allison. Reyes put down $780 in earnest money for those lots. When Allison learned that electricity and water had been turned on the property, Allison indicated that the $780 would be used to pay those expenses. The three additional lots fronted the 11 acres that Reyes placed $9,000 in earnest money (trial transcript, pp. 258-62). Waters confirmed that no one other than Reyes was authorized to move onto the property between September 1 and 7, 2000 (trial transcript, p. 261). Waters also verified that Reyes initially intended to give Allison $9,000 in cash, but Waters

11

insisted that Reyes get a cashier's check. Reyes returned with three cashier's checks for $3,000 each (trial transcript, pp. 262-63).

Allison also explained that he placed his own lock on the shed. Neither Reyes nor anyone else had permission to remove the lock to the shed and replace it, or paint the windows black (Trial transcript, pp. 221, 224-25, 230-31; trial transcript, pp. 253-54).

On Thursday, September 7, 2000, Cameron County Sheriff's Sgt. Ricardo Perez was performing traffic observation duties in Brownsville, Texas. At approximately 8:40 p.m., Sgt. Perez observed a green Ford Expedition run a red light at Southmost Road off International. The Sgt. pulled over the vehicle and determined that Reyes was the driver and Martinez was a passenger in the vehicle (trial transcript, pp. 65-69, 122-23).

Reyes advised that the two were from Houston just visiting. Reyes explained that they were staying at a cousin's house in Olmito, identifying "David Gracia" as his cousin. The Sgt. spoke separately with Martinez, who told the Sgt. that he was staying at a residence with a relative of Reyes'. When asked where the pair were headed, Reyes and Martinez gave conflicting explanations (trial transcript, pp. 69-72, 108-09).

The officer's suspicions were further aroused because he knew that "David Gracia" was a known drug trafficker. Moreover, the conflicting stories provided by Martinez and Reyes caused the agent to give Reyes a written traffic warning, and to ask permission to search the Expedition. Reyes gave verbal and written consent to search (trial transcript, pp. 71-73, 162; trial transcript, pp. 314-19; GX 12–traffic citation; GX 13–written consent to search Expedition executed by Reyes; GX 26–traffic warning). This occurred notwithstanding information that the Expedition was registered in the name of Reyes' brother (trial transcript, pp. 110, 121). As noted later, one of the statements the officer found inconsistent was the claim that Martinez was staying with Gracia at a location other than the ranch (trial transcript, p. 166)

While Martinez remained inside the vehicle in the passenger side front seat and Reyes was outside the vehicle, the officer found a green Sears craftsman tool bag on the floorboard behind the driver's side seat. The bag was opened and the Sgt. found a yellow bag with a large amount of currency (GX 32, 34–photos of currency; GX 33, 36–photos of Sears tool bag and yellow bag). The officer secured the bag in the Expedition, and notified his dispatcher to send backup (trial transcript, pp. 73-77).

It was later revealed more than $41,000 was inside the bag. Additionally, two drug ledgers were found inside the bag and a calculator (trial transcript, pp. 292-300; GX 30–calculator found in currency bag). The bag also contained a book with a

13

laundry list of items to purchase such as an acetylene torch, primer and spray paint, air freshener, locks for the "nursery fortress"[1] (trial transcript, pp. 76, 81-86, 110-11; GX 22–black book that includes words "jack for shed"; GX 35–photo of additional belongs found inside the bag). Both Reyes and Martinez carried calculators as well (trial transcript, pp. 293-94).

An expert witness, United States Customs Service Criminal Investigator Kristen Rosenbeck testified that writings on the ledger (GX 22) revealed that 642 pounds of marihuana valued at $140 a pound equaled a $90,000 transaction involving "Benjy" (trial transcript, pp. 300-02). A "to-do" list was found inside the black book found with the currency (trial transcript, pp. 301, 329; GX 22–black book). The book included a phrase "look for nursery for trees", which was explained as code language to find a stash house to hide the contraband (trial transcript, pp. 302-03). The materials listed included items that, by themselves would be innocuous; however, the items, trash cans, mops, brooms and cleaning materials including air freshener, coupled with the myriad of financial transactions listed along those entries indicated that materials for packing marihuana and cleaning up after the fact were included in the "to-do" list (trial transcript, pp. 302-04, 333).

---

[1]The phrase "look for nursery fortress' was also suggested to read "look for nursery for trees." (trial transcript, pp. 330).

14

Also found in the currency bag were traffic citations dated August 8, 2000 (GX 24), a Department of Public Safety traffic warning dated August 27, 2000 (GX 26), and a traffic citation dated August 31, 2000 (GX 25). These items were all issued to Martinez and found in GX 22 with the currency (trial transcript, pp. 314-19). GX 24 reflected that Martinez was driving a blue 2000 Dodge Grand Caravan on August 8, 2000 (trial transcript, pp. 318-19). Government exhibits 25 and 26 related to citations issued to Martinez while he was driving the Chevy Impala (trial transcript, pp. 317-18).

Upon the arrival of backup law enforcement officer Deputy Tony Arriaga, Sgt. Perez asked Martinez and Reyes who the bag belonged to and Reyes claimed it was his. When the currency was removed and displayed, Reyes said, "How did that get there?" When asked about the money inside, both Reyes and Martinez claimed they had no idea (trial transcript, pp. 79-80, 122).

Sgt. Perez placed the bag in his trunk (GX 35–photo of contents of bag). Sgt. Perez invited Martinez and Reyes to accompany him to the Sheriff's Office, and the two men drove the Ford Expedition to the office. Upon arrival and simultaneous to the officer exiting his patrol unit, Reyes exited his vehicle and exclaimed "We've got–we have somebody to claim the money. Mr. Martinez's cousin will claim the

money." Martinez "yelled out" to Reyes "to shut up and not to say anything." (trial transcript, pp. 80-81).

Sgt. Perez inspected the green bag and found a drug ledger, a copy of the sale of the land and blueprints to the property (GX 1–real estate contract; GX 21–drug ledger/notebook; GX 22–second drug ledger/notebook; GX 49–blueprints for the property) (trial transcript, pp. 81-82).

Martinez asked for the property blueprints and real estate paperwork to be returned to him. The officer explained that he would retain the document for investigation purposes, photocopy it and provide the originals back to Martinez and Perez. Martinez insisted upon the return of the documents two or three more times, claiming the items belonged to him, but was rebuffed by Sgt. Perez. When the money had been counted, Martinez' driver's license was used to confirm his claim to the currency (trial transcript, pp. 77-78, 80-86; GX 35–Martinez' driver's license confirming his claim to the currency). Reyes and Martinez then left upon being provided a receipt for the currency (trial transcript, pp. 78, 84-85).

The officers also found several hundred dollars cash on Martinez' person as well as on Reyes' person (trial transcript, pp. 78, 125). More than $42,000 was seized from the vehicle and the two men (trial transcript, pp. 78-79).

After Reyes and Martinez departed the station, Sgt. Perez contacted former DEA Task Force Agent and current Harlingen Police Detective Leo Silva. Sgt. Perez explained that he contacted Detective Silva based upon Silva's expertise with David Gracia. Sgt. Perez discussed the evidence he found and the identities of the persons then-known to be involved in the currency seizure. Upon culling information they had between themselves and other law enforcement colleagues, Sgt. Perez and other officers drove to the Olmito ranch as reflected on the earnest money contract (trial transcript, pp. 86-87, 114-15, 142, 171-72, 191-92).

Sgt. Perez brought the currency with him to a location, a convenience store located near the ranch house, where a drug-sniffing canine unit was available along with Detective Silva. The drug-sniffing canine alerted to the presence of contraband on the currency (trial transcript, pp. 87-89).

At approximately 11:30 p.m., the law enforcement team members consisting of an additional 9 or 10 officers arrived at the rendezvous point, the convenience store. It was decided to approach the ranch which was located approximately one mile north of state road 510 and FM 803. A closed gate greeted the officers as they were entering the ranch from the roadway, and it was opened by an officer. A long road led to a second gate which necessitated being opened as well. As the officers proceeded to the residence, located at the rear of the property, in their marked patrol

17

units, they saw lights and could feel the air conditioning running in the house. The doors to the premises were wide open, both front and back. Some team members approached a shed about 30 to 40 yards from the ranch house where they observed a large quantity of marihuana inside. The "purplish-blue" Chevrolet Impala was parked, trunk facing the shed, and the agents saw that a window to the shed had been broken. Also parked on the premises was a black Mitsubishi 3000GT sports car (trial transcript, pp. 140). In plain view, the officers saw bundles of marihuana wrapped in large brick forms with cellophane wrapping all around the bundles. The shed had a running air conditioner too. It was apparent to the officers that the Impala was in the process of being loaded with contraband when the operation was interrupted (trial transcript, pp. 89-95, 172-74, 200; GX 3–photo of residence; GX 6–photo of marihuana in shed; GX 11–photo of broken window to shed; GX 15–photo of interior of Chevy Impala). It was also apparent this was a stash house (trial transcript, pp. 179-80).

The officers then turned to the Chevy Impala, and officers observed other bundles of marihuana. The vehicle was secured, and bundles were being removed. Inside the vehicle, the officers found an athletic bag with three bundles of cocaine weighing approximately nine kilograms. Also inside the bag were documents with Martinez' name on them, including tickets from the Chevy Impala bearing Martinez'

name and writings by Martinez (trial transcript, pp. 284; GX 16–reflecting green bag with drugs and other contents; GX 17–receipt found in Impala). In total, 400 pounds of marihuana was seized from the Impala, and 398 pounds of marihuana in Reyes' shed (trial transcript, pp. 89-95, 99-104, 147, 174-76; trial transcript, pp. 282-85; GX 28–bail bond receipt).  A number of other items were found in the Chevy Impala (trial transcript, pp. 187-88; trial transcript, pp. 283-85; GX 41–green blanket; GX 43–blue bag; GX 44–blue bag with yellow stripes; GX 46–small blue bag; GX 47–blue eastport bag; GX 48–brown garment bag; GX 17–receipt).

On GX 28, the officer's found a receipt from RO-QUE bail bonds in the name of Mark Anthony Martinez.  This was found inside the bag filled with cocaine (trial transcript, pp. 102-06, 135; GX 29–photo of document in drug bag; GX 42–green bag found inside Chevy Impala with drugs). Also found inside the Impala was a traffic citation issued to Martinez in the town of Laguna Vista, dated September 5, 2000 (GX 27A; trial transcript, pp. 315, 318).

Finally, the search of the Chevy Impala also revealed a driver's license in the name of Marcellino Delgado, a compact disk case with compact disks, three VHS videotapes, one calculator, one remote control, two photos, a blue folder with documents, receipts, a radar detector, four charges, a phone speaker and one compact

disk face plate. Martinez' father retrieved those items on behalf of his son (trial transcript, pp. 319-20).

The officers found several photographs in the ranch house, including a photo of Martinez pictured with a shovel and another unidentified person in the picture (trial transcript, pp. 112-GX 5–photo of Martinez and unidentified person). They also found a bag with nine rolls of clear tape, cellophane wrap and a money gram (trial transcript, pp. 177-82; GX 50–bag with items in it including money gram). The money gram reflected that it was sent at 4:32 p.m. on September 7, 2000 by "Eleazar Torres". (trial transcript, pp. 195-96). Other items found at the ranch site include a hydraulic jack, Saran wrap and other items. Sgt. Perez testified that a hydraulic jack and Saran wrap found on the premises is used to compress large bundles of marihuana (trial transcript, pp. 158-64).

Investigator Rosenbeck identified Torres in several photographs seized from the ranch house (trial transcript, pp. 304-10; DX 1–photo of Torres a/k/a "Little Red" with tattoo on his leg; GX 52–photo of Torres). A disposable camera was found inside the ranch house that included photos of Martinez (GX 55), Martinez and Cruz (GX 56) Reyes and Cruz (GX 61–photo of Reyes and Cruz) and Reyes (GX 63–photo of Reyes) (trial transcript, pp. 306-14). The photo of Martinez and Cruz was taken between September 1 and 7, 2000 (trial transcript, pp. 314).

20

As the officers continued their inventory, a Ford Aerostar arrived on the property some time after midnight, September 8, 2000. As soon as the van approached a second gate toward the ranch house, it made a u-turn and accelerated at a high rate of speed. The chase was on with the vehicle being followed by marked patrol units at speeds exceeding 90 miles an hour. After a lengthy chase, the Ford Aerostar was pulled over several miles from the ranch. The driver was identified as Contreras. Reyes, the passenger, jumped from the vehicle and fled. Reyes was apprehended in a cornfield by a border patrol agent who assisted in the investigation (trial transcript, pp. 264-72. Sgt. Perez and the other officers concluded that the van was a vehicle used for smuggling contraband (trial transcript, pp. 95-99, 151-53, 190, 232-42; GX 37–photo of Ford Aerostar; GX 38–photo of interior of Ford Aerostar showing a stripped inside rear compartment).

When Contreras and Reyes were returned to the ranch, officers observed Martinez driving the Ford Expedition on the road outside of the ranch house entry road. He was pulled over for weaving "all over the road", but was determined not to be intoxicated. Martinez was arrested in connection with the drug seizure on the ranch (trial transcript, pp. 138, 182-83, 197; trial transcript, pp. 273-79).

Allison testified that the shed door had locks on it that were not placed there by him (trial transcript, pp. 214-22). Allison identified GX 48 as a garment bag he

placed in the shed, and identified the name "James T. Thompson" as his stepson's name found on a suitcase. Thompson was not involved in drug smuggling (trial transcript, pp. 222-23, 227-29). Furthermore, officers did not find any furniture in the residence or shed; instead, they found evidence that at least two persons were staying at the house, confirmed primarily by two sets of footprints that led from the shed down into a canal (trial transcript, pp. 128-29, 141, 176). The officers found photographs of various persons that were at the ranch between September 1 and 7, 2000 (trial transcript, pp. 192-94)..

Martinez stipulated that the contraband seized in the case on September 7, 2000, constituted nine pounds of cocaine and 400 pounds of marihuana that were found inside Martinez' blue Chevrolet Impala and the 398 pounds of marihuana found in the shed (trial transcript, pp. 183-85; GX 19, 20–samples of marihuana and cocaine respectively).

No defensive testimony was presented (trial transcript, p. 379).

### 8.

### A.

Martinez does not identify which of his two retained counsels rendered ineffective assistance of counsel. He faults the trial strategy of pursuing a motion

to suppress evidence and Martinez' live participation in the pre-trial hearing as a witness.

The government had evidence Martinez was in possession and, in fact, driving the blue Impala on August 28, 2000, that was found later to contain a load of contraband. Surveillance officers even took a photograph of the car being driven by Martinez (trial transcript, cited as trial transcript, pp. 168-71, 198; GX 10–photo of Chevy Impala taken August 28, 2000). Martinez was in possession of marihuana on that date (trial transcript, pp. 204-06).

The Chevy Impala belonged to Martinez. His father collected his personal items from the vehicle, including CDs, a calculator, videotapes, remote control, a blue folder with documents, receipts and other items (trial transcript, pp. 319-20). Martinez was demonstrated to have been in possession of the vehicle on August 27, August 28, August 31, and September 5, 2000. Inside the vehicle were found GX 28, a bail bond receipt in his name, and GX 27A–a traffic citation issued to Martinez on August 31, 2000. Those items were in the same bag containing the 4.1 kilograms of cocaine found in the Impala. Martinez was shown to have had constructive possession of the Impala.

Martinez was also later found driving the same Ford Expedition that had been pulled over by Sgt. Perez on the evening of September 7, 2000. Martinez was a

passenger in the vehicle with Reyes at 8:40p.m., and Sgt. Perez found a bag containing personal documents issued to and belonging to Martinez. Inside the bag was more than $41,000 and a calculator. Both Martinez and Reyes possessed calculators as well. The money was initially disclaimed by both men; however, the presence of Martinez' traffic citations dated August 8, 2000 (GX 24), the Department of Public Safety traffic warning dated August 27, 2000 (GX 26), and a traffic citation dated August 31, 2000 (GX 25) refuted Martinez' claims. The government exhibits 25 and 26 related to citations issued to Martinez while he was driving the Chevy Impala. The bag also contained GX 1, the earnest money contract to the 11 acre ranch. It was Martinez who insisted that Sgt. Perez return the documents to Reyes and himself. A drug-sniffing canine alerted to the presence of drugs on the currency. The money, coupled with drug ledgers and the analysis of notations on GX 22, could be inferred the proceeds from drug transactions.

Reyes purchased the property with the intent of transforming it into a stash house, and Martinez' guilty knowledge of that fact is demonstrated by (1) his insistence that GX 1 be returned–before the scheme was unraveled by the unsuspecting Sheriff's Deputy's inspection of the documents relating to the ranch property; (2) Martinez' constructive possession of the bag of currency; (3) the possession of calculators separately and in the bag of $41,000 in currency; (4) his

return to the ranch property in the Ford Expedition; (5) the presence of the Chevy Impala on the property; (6) the presence of a disposable camera on the ranch property with photographs of Martinez, Torres and Reyes; and (7) photos of Martinez' physical presence at the ranch between September 1 and September 7, 2000. Martinez was not authorized to be on the ranch premises, and that is a factor that also contributes to demonstrating a concert of action. Drug ledgers were also found in the bag seized from the Expedition, that also included a laundry list of items needed for the stash house operation.

Martinez and Reyes gave conflicting stories concerning their presence in the Ford Expedition and ultimate destinations, a circumstance that aroused Sgt. Perez' well-founded suspicions. The jury could infer guilty knowledge based upon the implausibility of his explanation for being present at the scene. *See United States v. Ramos-Garcia*, 184 F.3d 483, 466 (5th Cir. 1999); *United States v. Jones*, 185 F.3d 459, 464 (5th Cir. 1999)(implausible story permits inference of guilty knowledge), *cert. denied*, 121 S.Ct. 125 (2000); *United States v. Steen*, 55 F.3d 1022, 1032 (5th Cir. 1995) ("knowledge from suspicious circumstances that demonstrate the defendant's consciousness of guilt" can be inferred, including circumstances where a defendant supplies "inconsistent, implausible, or fabricated explanations" for his possession of the drugs)(citing, *inter alia*, *United States v. Richardson*, 848 F.2d 509,

25

513 (5th Cir. 1988) (hidden compartment case)); *United States v. Casilla*, 20 F.3d 600, 606 (5th Cir. 1994)("less than credible stories" and inconsistencies "are well-recognized circumstantial evidence of guilty knowledge" and support convictions for conspiracy, importation, possession with intent to distribute and aiding and abetting); *United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993)(a less-than-credible explanation and inconsistent statements supported finding of guilty knowledge in conspiracy and possession with intent to distribute convictions); *United States v. Arzola-Amaya*, 867 F.2d 1504, 1512 (5th Cir. 1989) (same).

Martinez' instruction to Reyes to "shut up" about the ownership of funds in the currency bag demonstrates his knowledge of the operation and complicity in the concealment of the crime.  The concert of action, Reyes arriving at the scene in a potential load vehicle, accompanied by Contreras, and Martinez' presence along the ranch road, consistent with the inference he was engaged in counter-surveillance activities,  also supports Martinez' convictions. Hence it was understandable that Reyes would flee upon determination that law enforcement had unraveled the connection of drug trafficking with the ranch house Reyes purchased. *See United States v. Lopez*, 979 F.2d 1024, 1030 (5th Cir. 1992)(flight as guilty knowledge).

Martinez' presence at the rendezvous location, following the seizure of $41,000+ in drug proceeds (as confirmed by the drug-sniffing canine alert), permitted

the jury to conclude he was guilty of the charges against him. *See United States v. Martinez-Moncivais*, 14 F.3d 1030, 1035 (5th Cir. 1994)("[I]t is reasonable for a jury to conclude that in the course of transporting millions of dollars of readily marketable [cocaine] through channels that should lack the protections of organized society, a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders."); *United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1096 (5th Cir. 1991). Martinez' presence and knowledgeable participation in several aspects of the trafficking endeavor is fully supported by the trial testimony. *See White* 217 F.3d at 445-48 (noting concert of action by Criner, Visoso and White and other evidence).

Furthermore, a *Pinkerton* instruction was submitted to the jury (1R. 88, pp. 86-87; trial transcript, pp. 391-92). *See Pinkerton v. United States*, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1183-84 (1946). Martinez was liable for all substantive acts by his coconspirators, including Reyes and the two persons who fled down to the canal. The evidence is sufficient to support convictions against Martinez.

Martinez' decision not to testify was not limited merely by his suppression hearing testimony; rather, there were a series of events where he was present and made incriminating statements that could not be easily explained during the trial. Martinez recognizes that the decision not to testify at trial was based upon a strategic choice he and his attorney hammered out. "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable". *See Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066 (1984). The record reflects, and Martinez admits, that a clear strategy was formed to defend the case. No error or prejudice has been shown.

Importantly, Martinez does not explain his guilty conduct and evidence of his guilty knowledge based upon implausible, false and inconsistent stories he and his cohort Reyes identified to investigating officers. He identifies no deficiency and no"misrepresentation" made by any trial attorney. Moreover, Martinez' suppression testimony was not relied upon by the government to support his conviction.

## B.

In his second ground of error, Martinez faults trial counsel's agreement to stipulate to the "chain of custody" of the cocaine seized at the premises where drugs were found. e complains that there was a break in the custody of "his" vehicle containing the contraband, and the time between the seizure of the Impala and the discovery of cocaine there.

First, Martinez' defense was unrelated to the discovery of the drugs in his car. His defense was that he was not engaged in the drug offense; the other persons were engaged in the drug offense. It did not harm his case by agreeing with the obvious:

that marihuana and cocaine were found on the premises located at the house ostensibly purchased by Reyes.

Personal documents belonging to Martinez were found inside the Chevrolet Impala. Those documents included bail bond paperwork for his arrest that occurred on August 29, 2000 (GX 28–from  RO-QUE bail bonds) as well as a traffic citation found in a green bag (GX 42) that contained the drugs and Martinez' personal paperwork (GX 29–photograph  of cocaine with paperwork). Although there was documents bearing the name "Marcellino Delgado", Martinez' father retrieved those items. Inside the Chevy Impala was a driver's license in the name of Marcellino Delgado, a compact disk case with compact disks, three VHS videotapes, one calculator, one remote control, two photos, a blue folder with documents, receipts, a radar detector, four charges, a phone speaker and one compact disk face plate. Martinez' father retrieved those items on behalf of his son (Trial testimony, pp. 319-20).

The cocaine was seized along with marihuana. The drugs were in bundles and maintained in government custody. The sampling of the cocaine (GX 19. 20) occurred with the marihuana, and Martinez identifies no break in the chain of custody of the gym bag with his personal contents as well as 4.1 kilograms of cocaine. The evidence was sufficient to establish a chain of custody under *United*

*States v. Bermea*, 30 F.3d 1539, 1574 (5th Cir. 1992)(any break in the chain of custody goes to the weight of the evidence, not its admissibility)(citation omitted) and its progeny.   Again, Martinez faults the trial strategy that did not seek to blame the government for "planting" evidence.   There is no evidence that drugs were "planted", and the theory would have been wholly inconsistent with the defensive strategy employed at trial.

Importantly, Martinez could not detach himself from the Impala or Ford Expedition. Martinez was also later found driving the same Ford Expedition that had been pulled over by Sgt. Perez on the evening of September 7, 2000.   Martinez was a passenger in the vehicle with Reyes at 8:40p.m., and Sgt. Perez found a bag containing personal documents issued to and belonging to Martinez.   Inside the bag was more than $41,000 and a calculator.   Both Martinez and Reyes possessed calculators as well.   The money was initially disclaimed by both men; however,  the presence of Martinez' traffic citations dated August 8, 2000 (GX 24), the Department of Public Safety traffic warning dated August 27, 2000 (GX 26), and a traffic citation dated August 31, 2000 (GX 25) refuted Martinez' claims. The government exhibits 25 and 26 related to citations issued to Martinez while he was driving the Chevy Impala.   The bag also contained GX 1, the earnest money contract to the 11 acre ranch.   It was Martinez who insisted that Sgt. Perez return the documents to Reyes

30

and himself. A drug-sniffing canine alerted to the presence of drugs on the currency. The money, coupled with drug ledgers and the analysis of notations on GX 22, could be inferred the proceeds from drug transactions.

Reyes purchased the property with the intent of transforming it into a stash house, and Martinez' guilty knowledge of that fact is demonstrated by (1) his insistence that GX 1 be returned–before the scheme was unraveled by the unsuspecting Sheriff's Deputy's inspection of the documents relating to the ranch property; (2) Martinez' constructive possession of the bag of currency; (3) the possession of calculators separately and in the bag of $41,000 in currency; (4) his return to the ranch property in the Ford Expedition; (5) the presence of the Chevy Impala on the property; (6) the presence of a disposable camera on the ranch property with photographs of Martinez, Torres and Reyes; and (7) photos of Martinez' physical presence at the ranch between September 1 and September 7, 2000. Martinez was not authorized to be on the ranch premises, and that is a factor that also contributes to demonstrating a concert of action. Drug ledgers were also found in the bag seized from the Expedition, that also included a laundry list of items needed for the stash house operation. Martinez current theory that the government planted evidence is inconsistent with the theory that he was merely present at the crime scene. Martinez and Reyes gave conflicting stories concerning their presence in the Ford

Expedition and ultimate destinations, a circumstance that aroused Sgt. Perez' well-founded suspicions that turned the case back to the ranch property. Martinez' seeks to re-litigate his trial with a different strategy.

### C.

In ground of error three, Martinez complains that trial counsel failed to raise a Fourth Amendment complaint concerning the visibility of the contents of the shed. Martinez had no standing to complain about the shed, as found in the suppression proceeding. Moreover, Martinez had no standing to complain about the drug seizure as well.

Martinez' complaint that the 11 acres of land should not have been referred to as a "farm" or a "ranch" flies in the face of the trial testimony that John Allison owned the "farm" and witness descriptions of the premises as containing a "ranch house" and ranch.

### D.

Martinez presents a general attack on the sufficiency of the evidence to support his conviction in ground of error four. The Fifth Circuit found the evidence sufficient on direct appeal. Since the appellate court found there was adequate evidence to support his convictions, no attorney deficiency or prejudice can be shown. *See and compare United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997)(citing, *inter alia*,

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The substance of the claim was addressed by the court on direct appeal is procedurally barred on collateral review. *Id.* (citing *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986)).

Additionally, Martinez claims that co-defendant Reyes was a witness who was prepared to testify on his behalf. Martinez does not attach an affidavit from Reyes demonstrating that Reyes was available to testify for Martinez at trial, or the substance of Reyes' transfiguring testimony. Martinez also does not address the fact that his trial counsel (Martinez') unsuccessfully sought severance of his trial any way. Martinez' bald assertion that Reyes would exonerate him, given that Reyes himself did not testify at trial, is belied by the record.

Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of that to which a witness would have testified are largely speculative. *Schwander v. Blackburn*, 750 F.2d 494 (5th Cir. 1985); *Buckelew v. United States*, 575 F.2d 515 (5th Cir. 1978); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984); *Boyd v. Estelle*, 661 F.2d 388 (5th Cir 1981).

Williams does not offer an affidavit from the unidentified witness. *See Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978). In *Gaines*, an affidavit from a named witness was submitted, which affidavit substantially corroborated the defendant's

claim that he had been in an argument with the victim and the witnesses before the shooting; that the victim had displayed a shotgun; that the victim and one of the witnesses had robbed and assaulted Gaines.  In short a specific, named witness corroborated the testimony of the defendant.  That is not offered in this case.

Williams also fails to relate precisely to what the witness could attest. *See Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987). In *Sullivan*, counsel failed to locate and call five "occurrence" witnesses of whom counsel was aware through police reports, which witnesses had no apparent reason to assist the defendant, and which witnesses had given exculpatory statements to the police.  Here, Williams does not indicate there were any "occurrence" witnesses when he conspired with him or others to traffic in cocaine.  Nor does he claim that his unnamed witness had given statements exculpatory to him.

Thus,  assuming *arguendo*, that he does demonstrate a deficient performance, Martinez fails to demonstrate prejudice. *See United States v. Harden*, 846 F.2d 1229, 1231 (9th Cir. 1988)(finding failure to call relevant witness not prejudicial when evidence against defendant was overwhelming); *Washington v. Watkins*, 655 F.2d 1346, 1363 n.32 (5th Cir. 1981) (citing, *inter alia*, *Buckelew*, 575 F.2d at 521) (denying relief on ineffective assistance claim that was predicated on counsel's failure to call witness when petitioner failed even to allege how witness' testimony

would have been helpful); *United States v. Doran*, 564 F.2d 1176, 1177-78 (5th Cir. 1977) (denying relief on ineffective assistance claim that was predicated on counsel's failure to locate and subpoena two witnesses because "(t)here has been no affirmative demonstration of prejudice").

The tactical decision not to call certain witnesses, after investigation, is a legal strategy insulating counsel's representation from constitutional infirmity. *United States v. Pedigo*, 12 F.3d 618, 623-24 (7th Cir. 1994) (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066) ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable")). Martinez also presents no evidence to show why the proffered witnesses' testimony would have changed the outcome of the trial. The claim of an uncalled witness is without merit and should be rejected.

With regard to his complaint about the jury instructions, the instructions followed the Fifth Circuit Pattern Jury Instructions. Moreover, he fails to identify cause or prejudice for failing to raise the jury instructions complaint prior to the instant motion.

The four grounds justifying relief under 28 U.S.C. § 2255 are (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) that the

35

sentence was in excess of the maximum authorized by law"; and (4) that the sentence is otherwise "subject to collateral attack". 28 U.S.C. § 2255 (2000); *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995). After a conviction and exhaustion or waiver of any right to appeal, a court is usually "entitled to presume that the defendant stands fairly and finally convicted." *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001)(

Thus motions to vacate sentences "may raise only constitutional errors and other injuries that could not have been raised on direct appeal that will result in a miscarriage of justice if left unaddressed." *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)(citations omitted); *see Davis v. United States*, 417 U.S. 333, 346 , 94 S.Ct. 2298, 2305 (1974); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962).

To obtain post-conviction relief in a collateral attack, a defendant must show either (1) cause excusing his procedural default and actual prejudice resulting from the alleged error, *see Frady*, 456 U.S. at 167-68, 102 S.Ct. at 1594, or (2) that he is actually innocent. *Shaid*, 937 F.2d at 232. "'Actual innocence' means 'factual innocence, and not mere legal insufficiency.'" *Bousley v. United States*, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611-12 (1998); *United States v. Torres*, 163 F.3d 909, 911 n.9 (5th Cir. 1999). To prove actual innocence, the petitioner "must

demonstrate that, in light of all the evidence, it is more likely than not that no fact finder] would have convicted him." *Id.* (citations and quotations omitted). Martinez has failed to meet these requirements on all counts.

### E.

In his fifth ground of error, Martinez argues that his trial counsel "had a conflict of interest". However, his complaint relates to the refusal of the court to sever the defendants for trial. This is not an ineffective assistance of counsel claim; it is an attack on the court's denial of Martinez' severance motion. Counsel moved for severance. *See and compare United States v. Sidhu*, 130 F.3d 644, 650-51 (5th Cir. 1997)(where severance motion was not filed, but issue of joint trial was raise in motion for judgment of acquittal). No cause or prejudice is shown. *see Frady*, 456 U.S. at 167-68, 102 S.Ct. at 1594; *Shaid*, 937 F.2d at 232

### F.

Martinez fails to identify any inadmissible statements that were admitted during the trial. His complaint that counsel was ineffective in this regard is conclusory. Mere conclusory allegations are insufficient to raise a constitutional issue in a habeas case. *United States v. Woods*, 870 F. 2d 285, 288 n.3 (5th Cir. 1989); *Schlang v. Heard*, 691 F. 2d 796, 799 (5th Cir. 1982); *Lockhart v. Fretwell*, 506 U.S. 364, 368, 113 S.Ct. 838, 842 (1993)("[A] criminal defendant alleging

prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'")(quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064). *See United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993) (vague, conclusory claim subject to dismissal); *United States v. Acklen*, 47 F.3d 739, 743-44 (5th Cir. 1995) ("Mere conclusory" statements are insufficient to require limited discovery or an evidentiary hearing.). Moreover, the allegations are inadequate to support a claim of ineffectiveness. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).

G.

In his seventh ground for complaint, Martinez argues that trial counsel should have argued more strenuously the admissibility of Fed. R. Crim. P. 404(b) evidence of his prior possession of marihuana. The issue of admissibility of the prior possession of marihuana was raised and rejected on appeal. No further review is warranted. *Kalish*, 780 F.2d at 508.

Additionally, the district court in fact submitted a limiting instruction to the jury concerning Rule 404(b) evidence. *See* trial transcript, pp. 395-96. The evidence was admissible. *See United States v. Alarcon*, 261 F.3d 416, 424 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 854 (2002)(holding that admission of prior arrest for

drug offense not reversible under 404(b)).  Additionally, no prejudice can be shown

given that Martinez pled guilty to the drug charges in the indictment.

H.

In complaint eight, Martinez argues that the jury verdict was ambiguous.  The

complaint he raises appears to be in the nature of an *Apprendi v. New Jersey*, error.

Several circuit courts have held that *Apprendi* is not retroactively applicable for the

first time on collateral attack.  *Rees v. Hill*, 286 F.3d 1103 (9th Cir. 2002)(citing,

*inter alia, United States v. Sanchez-Cervantes*, 282 F.3d 664, 667-71 (9th Cir.

2002)); *In re Smith*, 285 F.3d 6, 9 (D.C. Cir. 2002); *United States ex rel. Perez v.

Warden*, 286 F.3d 1059, 1062 (8th Cir. 2002)(citing *Tyler v. Cain*, 533 U.S. 656,

662-63, 121 S.Ct. 2478, 2482 (2001)); *Hines v. United States*, 282 F.3d 1002, 1004

(8th Cir. 2002); *Hartman v. Lee*, 283 F.3d 190, 191 (4th Cir. 2002) (citing *United

States v. Sanders*, 247 F.3d 139, 151(4th Cir.), *cert. denied*, 122 S.Ct. 573 (2001));

*See Browning v. United States*, 241 F.3d 1262, 1265 (10th Cir.2001) (*en

banc*)(successive §2255 action); *Kaufman v. United States*, 282 F.3d 1336, 1337

(11th Cir. 2002).

Likewise, the Fifth Circuit has held that *Apprendi* complaints, which Martinez

in essence raises in the context of ineffective assistance of counsel, is not retroactive.

*United States v. Brown*, 305 F.3d 304, 308-09 (5th Cir. 2002), *cert. denied*, 2003 WL 1609400 ( April 28, 2003) (no. 02-9606).

Further, the evidence overwhelming demonstrates that Martinez, under *Pinkerton*, was liable for the substantive acts of his co-defendants. No error is shown.

## I.

In ground of error nine, Martinez turns on his appellate counsel, arguing that his previous complaints should have been raised on direct appeal. A trial attorney does not render ineffective assistance by failing to pursue a frivolous argument. *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995)(5th Cir. 2000)("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) (defense counsel not required to make frivolous arguments). The same concept applies to appellate choices. *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)("Counsel does not need to "raise every nonfrivolous ground of appeal available".). There is no showing that counsel's failure to raise a multiple conspiracies ground of error demonstrates a deficiency below the objective standard of reasonableness. *See Id.* (quoting rule). No error and no prejudice has been shown.

40

8.

No evidentiary hearing is necessary to resolve issues presented. *United States v. Samuels*, 59 F.3d 526, 530 & ns.16-17 (5th Cir. 1995)(citations omitted);*United States v. Bartholomew*, 974 F.2d 39,41-42 (5th Cir. 1992). Martinez alleges no facts which would be the proper subject of a motion to correct sentence, vacate the judgment, or which would warrant an evidentiary hearing under either 28 U.S.C. § 2255. Therefore, the government moves for dismissal, or in the alternative, summary judgment.

9.

Assuming, *arguendo*, that this Court determines that attorney affidavits are required, the government moves for the Court to order attorney Ed Cyganiewicz, Crispin C. J. Quintanilla and appellate attorney Ralph Martinez receive copies of Martinez' § 2255 motion and a copy of the government's response, and order affidavits to be filed at a date certain.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the government respectfully prays that Martinez' §2255 petition be dismissed or, in the alternative, be subject to summary dismissal.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

JAMES L. TURNER
Chief, Appellate Division

KATHLYN G. SNYDER
Deputy Chief, Appellate Division
Assistant United States Attorneys

JEFFERY A. BABCOCK
Assistant U.S. Attorney
P.O. Box 61129
Houston, Texas 77208-1129
Texas Bar No. 01481400
Federal Bar No. 9311
(713) 567-9201

\

## CERTIFICATE OF SERVICE

I, Jeffery A. Babcock, Assistant United States Attorney, certify that a true

and correct copy of the above document has been served by placing same in United

States mail, postage prepaid, today, June 1, 2004, addressed to:

Mark Anthony Martinez
No. 94369-079
United States Penitentiary–Pollock
PO Box 2099
Pollock, LA 71467

Jeffery A. Babcock
Assistant U.S. Attorney